## SCRIPPS v. SCRIPPS.
### No. 5329.

Circuit Court of Appeals. Sixth Circuit.
April 17, 1930.

DENISON, Circuit Judge, dissenting.

Charles E. Hughes, of New York City (John Weld Peck, of Cincinnati, Ohio, and Charles A. Brodek, John H. Perry, and Nathan R. Margold, all of New York City, on the brief), for appellant.

Newton D. Baker, of Cleveland, Ohio (Baker, Hostetler & Sidlo, of Cleveland, Ohio, on the brief), for appellees.

Before DENISON, MOORMAN, and HICKS, Circuit Judges.

MOORMAN, Circuit Judge.

This is a suit by the executrix of the last will and testament of James G. Scripps against Robert P. Scripps, the executor of the last will and testament of Edward W. Scripps, for an accounting for one-half of the profits and increase in values of the newspapers and allied businesses of E. W. Scripps from 1908 to 1920 under an alleged contract between Edward W. Scripps and James G. Scripps. Robert P. Scripps, as trustee under a trust agreement executed by Edward W. Scripps during his lifetime, was also made a party defendant upon the theory that the trust agreement was executed without consideration, and with notice of plaintiff's claim to the property therein conveyed.

We state as briefly as possible some of the important facts. Edward W. Scripps began his newspaper career in 1873, and by 1907 he had established and was publishing twenty-four newspapers in this country. Each of these newspapers was published by a separate corporation in which Mr. Scripps owned a controlling interest. The remaining interests were owned by members of his family or by trusted employees who were under agreement to resell their stock to Mr. Scripps when their employment terminated. Generally, each corporation had the same set of major officers, who controlled the papers from a common office in Cincinnati, Ohio, called the central office. In 1907, Mr. Scripps had five living children, two daughters and three sons. James G., spoken of in the record as Jim, the eldest son, was born in 1886 and died January 7, 1921, at the age of thirty-four years; John P., the second son, was born in 1888 and died in 1914 at the age of twenty-six; Robert P. was born in 1895, and is the defendant in this action in the capacity of executor and trustee.

During the years in which Mr. Scripps was building up his properties he had been in the active control and management of them. In 1906, his health began to fail, and, in 1907, it became necessary for him to relinquish some of his responsibilities. These he delegated to his associates, mainly to Mr. Atwood, who virtually became general manager of all the papers. Jim was then twenty-one years of age. He was averse to entering the newspaper business, but agreed with his

father to enter it temporarily at a salary of $500 a month. Later he agreed to remain in the business for a period of five years at a salary of $1,000 a month, $500 of which Mr. Scripps agreed to pay until Jim's services justified the payment of the full amount from the business. Jim soon gave evidence of the qualities that had made his father so successful. Atwood's health began to fail the latter part of 1907, and Mr. Scripps was in need of some one to take active control of all his enterprises. On March 24, 1908, he wrote to Jim: "I feel that the concern has outgrown me. * * * I have no longer the physical strength and active brain necessary to keep the whole concern in hand. * * * I do not yet feel too weak to grasp the whole situation in my mind. * * * I only feel too weak to enforce these policies. * * * You must not fail me and all that other great army of people whom the force of circumstances has made dependent upon you." Jim was made chairman of the board which controlled all the papers in 1909. The business prospered under his management, and on November 24, 1909, Mr. Scripps stated that he believed "the concern as a whole is further advanced, more enterprising and has better prospects than would have been the case had I (E. W. Scripps) or any other man as old as myself been in charge."

John had entered the business in the early part of 1909. In a letter of November 24, 1909, Mr. Scripps first expressed to these two sons, who were then in the business, his purpose to pay them something in addition to their salaries. Recognizing that they eventually would come into possession of a large part of his fortune, he said: "I am, as rapidly as possible to transfer to you and others the existing estate, and in one way or another, as occasion presents, to give you personally the benefit of a large part of the accretions to the estate resulting from your own labors." He was in the habit of dictating his thoughts to his secretary upon all manner of subjects. These dictations, called "disquisitions," were transcribed and sent to his children and business associates, or put in a file for their inspection. On April 10, 1910, he dictated a disquisition, stating that he was insistent that his sons should not permit themselves "to accept something for nothing from me," and yet that he was unwilling to accept "anything for nothing from them"; that for many years it had been his practice to divide equally with one man or set of men, or nearly equally, the profits of any enterprise that he went into or undertook; that he did not find it necessary to change that

practice, and he proposed a sort of partnership with his sons, he to take one-half of the profit and the sons to divide among themselves, perhaps according to his decision, the other half. He stated though that the most he could do at that time was to let them understand that they were to receive in unequal amounts, "in proportion to their ability and service, a fair share of the products of their joint labor" with him and his capital. A copy of this disquisition was furnished to Jim. Following this there were conferences and an exchange of letters, and on January 28, 1911, Mr. Scripps wrote to Jim, saying: It was understood from the time you took over the management and responsibility of the business that "I was to consider you and John as practically being my partners"; that if you were successful "your compensation and John's together should approximate one-half (½) of the actual increase of the value of the profits of the concern under your direction"; that "this arrangement is not in the nature of a contract, but that I, considering the interest of the concern as a whole, and my estate, felt that it would be profitable to make such liberal allowance for your services, * * * and that therefore there could be no dispute between yourself and John on one part and myself on the other, as I was to be the sole judge in finally passing upon values; that is to say, the increase of values and the value of your services." Jim replied, stating that while the three of them were agreed as to certain things, "I write you this letter to put in writing and make a record of certain understandings * * * already reached and agreed upon in conference. I propose that you shall divide between my brother John and myself fifty per cent. of the increase in the value of your property as set forth in your letter to me dated January 28, 1911." He further stated that it was to be understood that this arrangement was not "a contract or legal document or binding," but that it was purely and simply an understanding in which "you are to act as the sole and final judge; to decide all points in question, and that any ruling made by you shall be considered as being final." This letter was marked "approved" by E. W. Scripps. John wrote a similar letter to his father, which was also approved. The immediate result was the transfer of $300,000 in stocks to Jim and John. This was the first distribution under the increment plan. In authorizing it, Mr. Scripps stated to his sons that it was not to be considered a precedent, as he had not studied the case sufficiently "to make even a fair approximation of what will be

due to you on the plan of proportionate sharing of increment." He also stated that "it is my view to share with you the increment of increase of my property * * * taking into consideration the effectiveness of your work and not the results of mere luck"; but "such advances or transfers of property that I make to you shall never exceed more than one-half of the increment of my whole property."

Attempts were later made to reduce the understanding thus arrived at to a formal written agreement. Mr. Scripps was especially desirous of doing this. Conferences were held. Mr. Harper, the general counsel for the Scripps companies, drafted an agreement from notes taken at these conferences. This draft was initialed on every page by E. W. Scripps. It stated that he had proposed to his sons Jim and John to employ them on the basis of one-half of the increment of the property, that one partial distribution thereunder had been made, and that he desired to have the "arrangement put in binding and contractual form, and accordingly this memorandum agreement has been drawn up and signed." It provided that the arrangement should cover the period from March 1, 1908, to the death of E. W. Scripps, and it contained formulas for periodically ascertaining and distributing the profits and accretions of Mr. Scripps' newspapers and allied holdings. Mr. Scripps was to be the "final interpreter and umpire as to all questions arising under this contract"; and the sons (it was contemplated that Robert would come in later) were to have no rights which they could take into court during the lifetime of E. W. Scripps, "the purpose being that any and all claims hereunder shall be finally passed upon and decided by E. W. Scripps if he desires to do so." He was to have the right also to refer these matters to any other person for decision, and the decision of such person, at E. W. Scripps' option, was to have the same effect as his own, both of which were to have the same validity and finality, so far as legal, as a decision of a court of last resort. Other provisions dealt with the time of making distributions, the division among the brothers, and the duty of Jim with respect to these matters. Finally it said: "Business relations shall be fair and equitable," and it is hoped and presumed "that whatever E. W. Scripps says will be believed by his sons to be fair and equitable." Harper sent a copy of this contract to Mr. Scripps' sister, Miss Ellen B. Scripps, who was a stockholder in certain papers, stating he understood that it stated "in more formal language the existing understanding between E. W. Scripps and his sons." Copies of Harper's letter were sent to Mr. Scripps, Jim, and John. Jim was unwilling to execute this proposed agreement. He submitted it to Mosher, treasurer of the Scripps papers, and wrote Mosher on June 17, 1912, that he considered it absolutely impracticable from a business point of view; that "this plan if carried out" would raise a hundred and one different questions which would require interpretation, that it was too cumbersome for practical use. In the same letter he said, when "I saw you in Cleveland and Cincinnati, I left you to try and scale the mountain from the West side with the use of the proposed increment agreement as your ladder. I went around the East side of the mountain where I thought the climbing was better. My letter to you, or rather, my letters to you and John, were to tell you that I had succeeded in gaining a foothold on the East side of the mountain. Therefore there was no use for you to work away at the West side with the increment agreement. * * * " After stating what he thought it was necessary to do with reference to a distribution then under consideration, he said: "You see, my plan calls for no contract at all. I just go to my father every year or two and ask him if he thinks we are entitled to any special consideration. If he decides we are, then he decides how much; then I tell him what I propose to do in a letter. He marks his O.K. on the letter; I, as attorney-in-fact, transfer the stock to myself, and that's all there is to it. Anyway that's all I can see. Maybe I am wrong." He then went on to say that he and his brother should be paid like every other employee, every Saturday night; "I am awfully afraid of any working contract such as the proposed increment agreement would be. It is too big a thing to have in legal shape; too dangerous to the concern. I would rather go without any contract at all and take a chance on Dad changing his mind or take a chance on his death."

Following Jim's conference with his father, four letters were written by the latter on May 27, 1912, three to Jim and the fourth to Jim and John jointly. In the first of these letters Mr. Scripps referred to the distribution which he had made a year and a half before, and stated: "I considered at that time that the amount that I gave you was well within fifty per cent. of my aggregate earnings by cash profits and appreciation during the period of your service. I now desire that you shall take an amount of stock equal to one and one-half times the value of

the stock you received from me on the other occasion," leaving it to Jim to decide, after consulting John, what part each should receive. In the second letter he said, "as from time to time I transfer to you certain stocks or other interests I am only complying with the agreements already made, and I am complying with these agreements solely for the purpose of securing for the future better service." The third letter stated that Bob wanted to come into the business, and the writer desired that Jim deal with Bob just as he, the writer, had dealt with Jim and John, but thought "Bob should very clearly understand that there is a principle of our concern no one shall give anything or receives anything except for services rendered." The fourth letter dealt with the division between Jim and John of the distribution then about to be made. Following and pursuant to this latest correspondence, Mr. Scripps approved of a distribution of $450,000 to his two sons "in partial payment for valuable services by them rendered to me." This was the second distribution.

On June 5, 1912, Jim wrote to John inclosing signed duplicates of their father's letters of May 27th, and discussing methods of ascertaining profits and increments and the division thereof between the two. A copy of this letter was sent to Mr. Scripps. Replying to it on June 8th, in a joint letter to Jim and John, Mr. Scripps stated: "Four years ago last February I retired in favor of my sons. It was perhaps a year after that I had formulated some method of dividing profits with you. By degrees I communicated to you my plans, and it has now settled into a formal arrangement. Already two partnership dividends have been declared, one of $300,000.00 and one of $450,000.00. * * * Charity in business I consider a bad thing. It is infinitely bad to the receiver of gifts, and it is bad enough to the giver of gifts. Personally I would no more think of corrupting your minds and morals by giving you gifts than I would of inducing you to indulge in harmful alcoholic and narcotic habits. * * * Already the time has come when the relations between you and myself have changed from that of father and son, of chief and subordinate—of patron and dependents; to those of business partners." Jim was not satisfied. On July 7, 1913, he wrote his father as follows: "You have known for a long time that the increment agreement or understanding in its present form is unsatisfactory to me. For a number of reasons I did not want any contract existing which could not be terminated at any time. * * * I want a new increment plan drafted; I don't want it to be a contract. I propose that you shall be the sole and final judge. I propose that settlements under the agreement shall be made annually, and I propose that each transaction in itself shall be final and complete; that is, that there shall be no drawback strings whatever on any dividend or division made. I want something definite that I can count on; something on which I can figure whether I make or lose a dollar." Mr. Scripps replied by letter dated August 3, 1913, that he had previously stated in writing and in conversation that from the date of his retirement from active business in the spring of 1908 Jim and his brothers should receive as compensation for the management of these properties during his, Mr. Scripps' lifetime, one-half of all cash profits from his various newspaper stocks, less the loss of other such newspaper stocks, and further, they should receive in cash, stock, or bonds a sum equal to one-half of the aggregate net increase in value of his total newspaper stocks, such increase to be reckoned from the date of his retirement; that he considered this fair and just compensation such as he had been in the habit of giving to other managers of individual newspaper properties.

Jim remained dissatisfied. He prepared a draft of agreement, as did Mr. Harper. Both drafts were submitted to Mr. Scripps, and rejected. Finally, on August 26, 1913, Jim wrote his father: "I would have liked very much to have drawn up a new working arrangement. * * * I have firmly believed, and still believe that in the management of the business I should know the exact amount to be drawn from it a year in advance. I have fought this thing out with you, and after a dozen lickings and no victory, even though I am strong on the persistency idea, I have concluded to give it up." On September 1, 1913, Mr. Scripps dictated a letter in the presence of Jim stating: "I offered James G. Scripps, and later John P. Scripps, to pay them one-half of my actual increments in profits and stock appreciations of my newspapers and allied business; and an agreement therefor has been in effect for some years and is regarded as a permanent feature of the business." The letter further stated that it was the desire of Mr. Scripps, in lieu of an increment dividend at that time, two of which had been previously declared, that Jim should increase his cash drawings from earnings which had already accrued

or were accruing. About six months later Jim again asked for an increment distribution. The amount he wanted was $300,000. Mr. Scripps was inclined to think it was due him, but thought it was not prudent for him to take down so large an amount at that time, and only approved the payment of $100,000, stating, that "in the end he (Jim) will collect every penny due him, not only in principal (of the value of the stock at a given time) but of the appreciation of that stock from that time." On March 24, 1914, Mr. Scripps authorized Jim to transfer to himself stocks of the value of $100,000 "in partial payment for services heretofore rendered me (in accordance with the understanding outlined in my letters of February, 1911)." This distribution was made to Jim alone, because John was no longer actively connected with the business.

In November, 1915, Jim wrote his father: "I would like to have another increment division. I would like to know just what I have to do to earn it. * * * I would like to have a contract with you which would have incorporated in it a copy of your will, whatever that might be. I think I would like to waive the iron-clad [evidently meaning the increment] agreement, and in lieu thereof have this new contract." On December 22d this request for an increment division was repeated, but Mr. Scripps was unwilling to grant it at that time. In March of 1916, Mr. Scripps executed a power of attorney to Mr. Harper, authorizing him, among other things, to act in all business and financial transactions with James G. Scripps, "including payments on account of my increment agreement with him." Shortly thereafter Mr. Harper gave Jim authority to transfer to himself approximately $340,000 of increment, and to increase his salary to $36,000 a year. The letter which Mr. Harper wrote authorizing this distribution stated that it was in "partial payment" for services rendered. This was the fourth and final distribution.

In the summer of 1917, Bob entered the business. Differences in questions of policy soon arose between the two brothers. Mr. Scripps was inactive. Much of his time was spent upon his yacht. A break came between Jim and Bob in 1919. Following this break Mr. Scripps submitted to Jim a memorandum stating that it was understood and agreed that all arrangements and mutual understandings, verbal and written, between them, were abrogated. It also stated that whether further remuneration for past services could fairly be accepted by Jim or made by his father would depend upon the father's discovering whether the future proved that Jim had turned back to him complete control of that part of the business in which Jim exercised no considerable stock influence under such conditions as would permit the father easily to conduct the business as profitably as it had been conducted before Jim entered into his employment as chief manager. At a conference held a few days later Mr. Howard was placed in charge of the business part of the newspapers, and Bob was continued as head of the editorial side. Jim asked his father at this conference, "Who is going to drive this team when they get to pulling in opposite directions?" Mr. Scripps said, "I guess you will have to, Jim." Jim replied, "Well I can resign at any time I want to," and Mr. Scripps said, "I can fire you at any time I want," to which Jim replied, "If you do I will collect under the increment," and Mr. Scripps said, "You won't be such a fool as that, because if you do I will change my will." Jim left the room, and then came back smiling and said to his father, "Well, I am not going to resign." Shortly thereafter, on June 12, 1920, Mr. Scripps issued a written statement in which he said he was formally announcing that there was no occasion for his making any further distribution of increment to Jim; that until the future should demonstrate that he had profited by Jim's services so greatly that Jim's compensation had not been fully equal to what he (Mr. Scripps) had always conscientiously felt was due to an assistant, he would make "no more presents to Jim in the way of stock or other considerations." Jim considered this statement unjustified, and asked his father to withdraw it. The same day he wrote his father another letter, saying: "I do not accept this statement, and in another letter have requested you to withdraw it." He became ill in November of the same year, and died January 7, 1921. Mr. Scripps died March 12, 1926.

The question in the case is, Did Mr. Scripps enter into a contract with his sons by which he bound himself to pay them one-half of the increment and profits of his newspapers and allied businesses resulting from their management and operation of these enterprises, or was their understanding, "the increment agreement," a mere working arrangement, subject always to the power and right of Mr. Scripps to determine what his sons' services were worth and what part of the profits and increment they should have? The lower court was of opinion that

no binding or legal obligation came into existence as against either party. His view was that E. W. Scripps was acting within the sphere of parental bounty, and that it was never intended by either party to enter into a contract creating a legal obligation.

In insisting that this conclusion of the trial court was wrong, it is pointed out by appellant that Mr. Scripps repeatedly stated that he was not giving his sons "something for nothing." These statements, when considered apart from the circumstances under which they were made, undoubtedly indicate a contractual relationship, and yet in giving to them their proper evidentiary effect we cannot forget that Mr. Scripps paid his sons handsome salaries from the beginning of their employment, supplementing Jim's for a time from his private funds, that it was his hope to preserve intact his newspaper enterprises, which he expected ultimately to pass into their hands, and that he spoke of transferring his "estate" as rapidly as possible to them, and of the "force of circumstances" that had made others dependent upon them. He frequently spoke also of having two families—his newspapers, the children of his brain, and his sons and daughters, the children of his flesh. He was intensely interested in both, and it was his purpose, as we think the evidence shows, to have his sons take upon themselves the active control and management of the newspapers after his death. He understood, of course, that this plan would fail if his sons were unable or unwilling to carry it out, and quite as definitely, too, that a financial interest in the papers would be an incentive to the development of the industry and ability that it would be necessary for them to have. In our opinion, it was in recognition of these facts and in anticipation of the ultimate control of his properties by his children that he put upon his sons heavy responsibilities, and in addition to paying them large salaries devised the plan of transferring to them a part of the increment and profits of his newspaper enterprises.

It cannot be denied that Mr. Scripps' plan, as originally evolved and disclosed to his sons, was that he should be the sole judge of the value of their services and of what should be paid to them from increment and profits. The first distribution was made according to that plan. It is equally certain that it had not been changed as late as March of 1912, when he attempted to have reduced to "binding and contractual form" an arrangement which he desired to put into effect.

Jim was unwilling to execute the agreement proposed by his father at that time. He preferred to continue under the original arrangement. While he wanted frequent distributions, he wanted no contract at all, but wanted his father to determine, as he had theretofore done, how much he was entitled to. Thus it was that shortly after he refused to execute the proposed agreement he visited his father and succeeded in gaining his consent to a distribution of $450,000. We do not believe, though, that the conference which was then had resulted in the making of a new increment agreement, or that any such agreement is shown by Mr. Scripps' letters of May 27, 1912, or his later letters of August 3 and September 1, 1913. What was said in the letters of May 27th about "proposal to divide * * * half and half," and "agreements already made," had reference, it seems to us, to the plan and understanding that had theretofore been in effect, and not to any new arrangement that was made when Jim visited his father and obtained his consent to the distribution referred to in those letters. Having obtained that distribution, he stated to Mosher two weeks later, June 17th, that there was "no use" for him "to work away at the West side with the increment agreement," the Harper draft of agreement; that "my plan calls for no contract at all. I just go to my father every year or two and ask him if he thinks we are entitled to any special consideration. If he decides we are, then he decides how much." The letter of May 27, referring to "agreements already made * * * for the purpose of securing for the future better service" was written, it is true, to cover a point raised by Jim, and to make a record "for possible future use"; but it is to be remembered also in that connection that Jim was then seeking and wanted additional stock, his father was willing that they (he and John) should have it, and Jim wanted "no flaw" in it. Besides, as shown in Jim's letter to Mosher of June 17th, there was then no contract at all, and Jim's plan was to leave it to his father to determine whether he was entitled to "any special consideration," and if so, "how much."

The statements in Mr. Scripps' later communications that he and his sons had become "business partners" are not to be regarded, in our opinion, as declarations of a changed business relation, but only as repetitions of what he had previously stated was the status of their working arrangement. As early as January of 1911 he had said it was the understanding when his sons took over the manage-

ment of the business that he was to consider them "as practically being my partners." In his letter of June 8, 1912, when he again so described that relation, he referred to his plan for dividing profits as formulated four years before, which he said "has now settled into a formal arrangement." It was this same plan under which, as he said, two dividends had been declared—one for $300,000 in February of 1911, and the other for $450,-000 May 27, 1912. It is clear, we think, that Mr. Scripps was under no contractual or legal obligation to make these first two distributions.

Jim's letter of July 7, 1913, stated that the "increment agreement" was "unsatisfactory" to him; that he wanted a "new increment plan drafted"; "something definite," with "no drawback strings," on which he could figure whether "I make or lose a dollar. * * *" This letter indicates that there then existed an agreement, but what agreement was it? He says his father had known "for a long time" that the agreement was unsatisfactory to him. Obviously this agreement to which he refers was not an agreement made in May of 1912, scarcely more than a year before. He speaks of the division authorized on May 27, 1912, but says nothing about any agreement of that date, and he says, "In fact instead of asking you for anything I would be willing to cancel the whole increment business, etc." Replying to this letter August 3d, Mr. Scripps said that he had "previously stated," that from the date of his retirement in 1908, his sons should receive one-half of the net profits and increased value of his papers. This does not indicate that a new agreement had been entered into or that there had been any change in Mr. Scripps' plan as outlined in 1911. Nor does the letter of September 1, 1913, define any other arrangement. That letter was written after several conferences, and three drafts of agreement had been prepared, but not agreed upon. One of these was prepared by Jim in his own handwriting. It dealt mainly with cash divisions, and provided that this "understanding shall in no way interfere with the present increment agreement," and "this like increment arrangement shall in no sense [be] considered as being a contract." None of these drafts, as we have said, was executed, and the only result of the conferences was the letter of September 1st. That letter speaks of Mr. Scripps' offer to Jim, and later to John, to pay them one-half of the increment and profits of his newspapers, and says that "an agreement therefor has been in effect for some years, and is regarded as a per-

manent feature of the business." Here again, to what agreement does he refer? Evidently not to an agreement that had been recently formulated, but to one that had been in effect "for some years," the one that he referred to in his letter of June 8, 1912, and which, as he said, he had formulated four years before and "has now settled into a formal arrangement," the one that had been "unsatisfactory" to Jim "for a long time" on July 7, 1913. It was the agreement outlined in Mr. Scripps' letter of February, 1911, under which he specifically authorized the later distribution of March 24, 1914.

It does not have to be said that it was perfectly competent for the parties to act within the sphere of legal obligation, and that it was within the power of Mr. Scripps to bind himself to pay his sons for their services, in addition to large salaries, one-half of the increment and profits of his newspaper businesses. If he made a definite proposition of that kind to them, without reserving to himself the right to determine what their services were worth, and Jim, acting upon it, performed the services, there obviously devolved upon Mr. Scripps the obligation to pay accordingly. Fahrenwald v. Ohio Steel Foundry Co., 16 F.(2d) 658 (6 C. C. A.); 1 Williston on Contracts, §§ 22a, 68 and 90. The question is, What did he offer to do? The letter of January, 1911, was specific as to a division of approximately 50 per cent. of the increment and profits among his sons; but it stated quite as specifically that he was to be the sole judge of the increase in values and the value of their services. We have no doubt that at that time and later, when the distributions were made, Mr. Scripps expected that Jim would continue at the head of the business, and eventually, too, that he and his brothers would receive one-half of all increment and profits resulting from their management of it free from any claim of Mr. Scripps' estate. When Jim first severed his connection with the business, Mr. Scripps was not then sure that he would not transfer other stocks to him, but then, as always theretofore, he thought, it seems to us, that that was a matter for his sole determination. That was the arrangement under which they had started, which Jim was unwilling to change, and which, in our opinion, was never crystallized into any legal obligation.

We do not consider it important that Mr. Scripps took credit in his income tax return for the year 1916 for what he had distributed to his son in profits and increment during that year, or that Jim charged to him-

self as income what he had received. Mr. Scripps wanted to compensate his sons for their services, and apparently he regarded this distribution as compensation for services rendered. So regarding it, he took credit for it in his tax return, and Jim likewise reported it as a part of his income. It does not follow from this, however, that either of the parties regarded Mr. Scripps as legally bound to pay his sons fifty per cent. of the profits and increment of his newspaper enterprises. No such obligation existed if he reserved to himself the right to determine the value of their services and the amount of this character of compensation that they should receive. Canadian National Railway Co. v. George M. Jones Co., 27 F.(2d) 240 (6 C. C. A.). It is true that "Increment agreement" is frequently referred to in the correspondence, but that same agreement was said by the parties not to be a binding contract, and we have not observed anywhere in the evidence that Mr. Scripps ever surrendered his right to determine the amount of his sons' compensation, or where it was ever claimed by Jim that he had a legal right to any part of the increment or profits. Jim's whole course of conduct indicates that he understood that the matter of compensation was entirely within the discretion of his father. John died in 1914, and neither Jim nor his father thought it necessary to compute increment and profits for a final division with his estate. More than four years elapsed between the last distribution to Jim and his death, and, during that time, though he requested increment divisions frequently, and was as frequently refused, there was no demand by him upon his father for a distribution as of right. He was a man who insisted upon his rights and spoke his mind freely to his father and others. The only intimation that he ever gave of any contract right was when he severed his active connection with the papers; and while he intimated at that time that if he were discharged he would collect the increment, he took practically no part in the management of the papers thereafter and was informed that his father would make no further distribution to him, and yet, until his death in January of 1921, made no claim at any time that he was entitled to a further distribution. If any legal obligation arose between the parties, it was evolved from the original arrangement of 1911. Mr. Scripps was then dealing with his sons in connection with properties which he hoped to preserve intact to be operated ultimately under their control. With this object in view, he put them in positions of responsibility when they were young, much younger than men are usually given such responsible positions, paid them handsome salaries, and agreed to transfer to them such parts of the increment and profits as he should think their services deserved. The arrangement which was then made between the parties is the background of all their subsequent dealings, and in our opinion it was never converted by interpretation or otherwise into a binding obligation.

In view of the conclusion just stated, it is unnecessary to consider the other defenses relied upon by the appellee.

The decree is affirmed.

DENISON, Circuit Judge (dissenting).

I agree that there was never any definite and obligatory change of the status created by the 1911 "arrangement"; there was only interpretation by conduct; but, thus interpreted, I think that arrangement was contractual. True, it was without definite term; but, as to compensation earned during the eight years while it was recognized by both parties and being carried out, it is not important that the arrangement might have been terminated during this period. True, also, that they say—"This is not a contract"; but people commonly think that a loose arrangement which either can end at any time is not a "contract." In later years, when the son from time to time wanted or did not want a "contract," he was chafing under the doubts as to times and amounts of increment division. He was uncertain whether to insist upon a contract for a more definite time and manner of payment, so as to know "every Saturday night," or whether to go "up the other side of the mountain" and leave the arrangement as it was.

Contemplating the 1911 arrangement by itself, we observe: The services to be rendered by the son were sufficiently identified; the later conduct of all showed there was no danger of misunderstanding on this subject. The measure of compensation could be rendered certain, without any uncommon difficulty in ascertainment. A standard was provided for fixing the time and medium of payment. The minds of the parties seem to have met on all these things; and, if so, a contract was complete. This conclusion would not be doubted except for the reservation to the father of certain powers, and except for the use made of the word "contract."

Were these reserved powers inconsistent with an underlying contractual obligation? How to measure the increment, the increase in value, was an obvious problem; its solu-

tion was confided to the honest business judgment of the father. The time when payment could be made depended on how much could be spared from the producing businesses, and, upon the father's needs, for personal use. These matters, too, were left with him. If the existence of an underlying obligation is not affected, questions which it is foreseen will arise in its execution, and which might be left to an arbitrator, may be committed as well to one of the parties (and as between father and son, this intent is not improbable). If the arbitrator dies without a successor, the questions which would have been arbitrated may then be decided by the courts. Here, we find that a method of appraising the increase was adopted, approved, and continued. The father's personal needs and decisions ceasing at his death, the law would fix a reasonable time for payment, and commute into money the value of the stocks involved. The phrase —"I am to be sole judge in finally passing upon * * * the increase of values and the value of your services," is not unreasonably entitled to the construction which both gave it. The father was to appraise the increase, and, if he thought the son's services not valuable enough to justify the half-increment pay, he could dispense with the services. The father's later conduct was full of admissions, express and implied, that the son's services were of the full expected value. He never suggested or thought of reducing the half to some lesser fraction.

The rather clear implication that only during his life were the father's decisions on these matters to be accepted as final goes far to indicate that every question left undisposed of at his death would be decided by the courts, if resort thereto were necessary.

The son's conduct in making no demand while he lived, and after the final breach of relations, was not inconsistent with his belief that he had rights which he could enforce at law, if he should think that such enforcement would not cost too high a price in other results.[1]

It is true, also, that the son has received compensation—large compensation—for his services; but this is not inconsistent with the father's attitude, up until the final breach, that these payments were only on account.

Upon the whole record, I am better satisfied to think that both father and son in-

[1] The father's will, making Jim residuary legatee of half the estate, was left unchanged until after Jim's death. Then, by a new will and trust, Jim's widow and children were (substantially) disinherited.

tended that, so long as the son continued to render and the father to receive the specified services, it became the father's legal duty to make compensation at the agreed rate—subject merely to his discretion, while he lived, as to the time and medium of payment.